ADVOCACY ORGANIZATION FOR PATIENTS AND PROVIDERS, a non-profit Michigan corporation, et al., Plaintiffs–Appellants/Cross–Appellees,

v.

AUTO CLUB INSURANCE ASSOCIATION, a Michigan corporation, et al.; Allstate Insurance Company, an Illinois corporation; Citizens Insurance Company of America, a Michigan corporation; Farm Bureau Insurance Company, a Michigan corporation; Farmers Insurance Exchange, a California corporation; Frankenmuth Mutual Insurance Company, a Michigan corporation; Imperial Midwest Insurance Company, a Michigan corporation, d/b/a Titan Insurance Company; Lincoln Mutual Casualty Company, a Michigan corporation; Secura Insurance Mutual Company, a Wisconsin corporation; State Farm Insurance Companies, an Illinois corporation; Transamerica Insurance Group, a California Corporation, d/b/a TIG; Wolverine Mutual Insurance Company, a Michigan corporation; Auto Owners Insurance Company, a Michigan corporation; Lahousse–Bartlett Disability Management, Inc., a Michigan Corporation, d/b/a Review Works, Rehab Works and Rehab Plans; Linkage Enterprises, Inc., a Michigan corporation, d/b/a M.I.E.S. Clinic; Manageability, Inc., a Michigan corporation, d/b/a Auditpro and Indemnicare; Medcheck Medical Audit Services, Inc., a Michigan corpora-

tion; Recovery Unlimited, Inc., a Michigan corporation, d/b/a Medical Review Systems, Defendants–Appellees/Cross–Appellants.

Nos. 97–1821, 97–1832.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 4, 1998.

Decided March 15, 1999.

**ARGUED:** Linda S. Fausey, Lansing, Michigan, for Appellants. Lori M. Silsbury, Dykema Gossett, Lansing, Michigan, for Appellees. **ON BRIEF:** Linda S. Fausey, Lansing, Michigan, for Appellants. Lori M. Silsbury, Dykema Gossett, Lansing, Michigan, for Appellees.

Before: JONES, RYAN, and BATCHELDER, Circuit Judges.

## OPINION

BATCHELDER, Circuit Judge.

Forty–Nine individual medical providers, two guardians of catastrophically injured auto accident victims, and a group established to be spokesperson for patients and providers ("Advocacy Organization for Patients and Providers," or "AOPP") filed a multi-count complaint against thirteen insurance companies, all of which have issued no-fault insurance polices to Michigan motorists, and five review companies, all of which have reviewed medical bills arising out of auto accidents for one or more of the insurance companies. Plaintiffs' complaint alleged, *inter alia*, claims under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b), against various combinations of the insurance companies and review companies, alleging that they had conspired to defraud patients and medical providers of reasonable medical fees. The district court granted Defendants' motions to dismiss, FED.R.CIV.P. 12(b)(6), and Plaintiffs appealed. For the reasons stated below we AFFIRM the judgment of the district court.

## I. PROCEDURAL HISTORY

Plaintiffs originally filed their multi-count complaint, including its 104 attached exhibits, in the state court in Michigan. The complaint alleges fifteen counts: (1) a request for a declaratory injunction as to the rights and responsibilities of the Plaintiffs under Michigan's no-fault statute; (2) a request for interim injunctive relief while the matter is pending; (3) a request for permanent injunctive relief based on a denial of due process; (4) tortious interference with existing contractual relationships; (5) tortious interference with business relationships; (6) conspiracy to tortiously interfere with existing business and contractual relationships; (7) common law fraud; and (8)-(15), eight counts of RICO violations against various combinations of two or more of the Defendants.

The Defendants removed the case to federal district court based on federal question jurisdiction arising out of the RICO counts. The Plaintiffs' motion to remand was denied.

The Defendants filed several motions seeking dismissal, including a "Joint Motion to Dismiss Pursuant to FED.R.CIV.P. 12(b)" that raised lack of standing, failure to state claims in various counts (including the RICO counts), and a statute of limitations defense. On June 23, 1997, the district court dismissed the RICO counts under Rule 12(b)(6) for failure adequately to allege a predicate act upon which the Plaintiffs could base their RICO claims and failure adequately to allege a RICO enterprise. The district court also dismissed the federal due process claim for lack of state action. Finding the remaining counts based exclusively upon Michigan law, the court remanded them to the

state trial court. This timely appeal followed.[1]

In this appeal Plaintiffs challenge the district court's dismissal of their RICO claims and ask that we either reverse the district court or vacate the district court's judgment and remand the case so as to allow them to amend their complaint. Defendants ask that the district court's order remanding the state law claims be reversed in the event that we reverse the judgment dismissing the RICO counts. Because we affirm the district court's decision concerning the RICO counts, we need not address Defendants' arguments pertaining to the district court's remand order. Further, because we conclude that the RICO counts must be dismissed, we need not address Defendants' contention that they are preempted by the McCarran–Ferguson Act, 15 U.S.C. § 1012.

## II. STANDARD OF REVIEW

 We review *de novo* a district court's dismissal for failure to state a claim. *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir.1996). To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988) (internal quotation marks and citations omitted).

> We must treat as true all of the well-pleaded allegations of the complaint. All allegations must be construed in the light most favorable to the plaintiff. In order for a dismissal to be proper, it must appear beyond doubt that the plaintiff would not be able to recover under any set of facts that could be

presented consistent with the allegations of the complaint.

*Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir.1996) (citations omitted). "Although this standard for Rule 12(b)(6) dismissals is quite liberal, more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements." *Scheid*, 859 F.2d at 436 (citing 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357, at 596 (1969)).

## III. "REASONABLE" MEDICAL EXPENSES UNDER MICHIGAN'S NO–FAULT INSURANCE ACT

Michigan has a system of mandatory no-fault automobile insurance. Among other things, this system requires Michigan drivers to purchase "personal protection insurance" ("PPI"), *see* MICH. COMP. LAWS ANN. § 500.3101 (West 1993), under which "an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of [the no-fault statute]," MICH. COMP. LAWS ANN. § 500.3105. Specifically, coverage under PPI includes "[a]llowable expenses consisting of all *reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation.*" MICH. COMP. LAWS ANN. § 500.3107(1)(a) (emphasis added). The statute also circumscribes the amounts that health care providers are permitted to charge for services performed for victims of auto accidents:

> A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by per-

---

1. The Defendants filed with the district court an emergency motion to stay the order of remand pending appeal or, in the alternative, for an order vacating the order of remand, which the court denied. Defendants filed a timely notice of cross-appeal challenging the remand of the state law claims to state court.

Defendants also filed a motion with this Court to stay the remand pending the outcome of this appeal. This Court denied Defendants' motion. For ease of reference, we will refer to the Plaintiffs/Appellants/Cross–Appellees as "Plaintiffs," and the Defendants/Appellees/Cross–Appellants as "Defendants."

sonal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, *may charge a reasonable amount for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance.*

MICH. COMP. LAWS ANN. § 500.3157 (emphasis added). These statutory provisions leave open the questions of what a "reasonable charge" is, who decides what is "reasonable," and what criteria may be used to determine what is "reasonable"— all questions at the core of this litigation. In 1992 and 1994 referenda and amendments were proposed which would have answered these questions by adding fee schedules to the no-fault act, but the proposals were not successful. *See Munson Med. Ctr. v. Auto Club Ins. Assoc.,* 218 Mich.App. 375, 554 N.W.2d 49, 56 (1996), *appeal denied,* 453 Mich. 959, 564 N.W.2d 887 (1996).

In late 1994 and 1995 the Michigan Court of Appeals issued two opinions that shed some light on these questions. First, in *McGill v. Auto. Assoc.,* 207 Mich.App. 402, 526 N.W.2d 12, 14 (1994), the court said, "When read in harmony, §§ 3107 and 3157 clearly indicate that an insurance carrier need pay no more than a reasonable charge and that a health care provider can charge no more than that." The opinion spoke at length about the important "medical cost-policing" function that no-fault insurers provide and how that function would be lost if they were not required to assess for themselves the "reasonableness" of the fees medical providers charged. *See id.* at 14–15. The court expressly declined to address whether insurers could use workers' compensation schedules as part of their "reasonableness" determinations. *Id.* at 15. Six months after *McGill* the court decided *Hofmann v. Auto Club Ins. Assoc.,* 211 Mich.App. 55, 535 N.W.2d 529 (1995), *appeal denied,* 452 Mich. 870, 552

N.W.2d 170 (1996), which rejected Auto Club Insurance Association's ("ACIA's") argument that when a physician charges a certain amount, but receives significantly less than that from most of his patients under a Blue Cross Blue Shield Plan, then the lesser amount is the amount "customarily charged" by that physician for that procedure and is, therefore, all that the no-fault insurer is required to pay. *See id.* at 556–57. The court specifically noted, however, that the "customary charge" and "reasonableness" language in Mich. Comp. Laws Ann. § 500.3157 constituted separate and distinct limitations on the amount providers may charge with respect to auto accident victims covered by no-fault insurance (that is, the "customary fee" charged by a particular provider does not define what a "reasonable fee" is); the court also noted that ACIA had not challenged the reasonableness of the particular charge at issue, basing its entire argument on what was, for that provider, a "customary charge." *Id.* at 557.

In late 1995 and 1996 the Michigan Court of Appeals shed some further light on these questions with three additional opinions. The first was *LaMothe v. Auto Club Ins. Assoc.,* 214 Mich.App. 577, 543 N.W.2d 42 (1995), *appeal denied,* 453 Mich. 930, 554 N.W.2d 916 (1996), in which the court reiterated that the insurer need pay only the "reasonable" medical expenses, rather than all of the medical expenses. *Id.* at 44. If the insurer paid expenses that were unreasonable, the court said, it would be violating the insurance contract, *id.,* and insurer scrutiny of medical charges was "compelled" by the no-fault statute, *id.* at 44 n. 3. The next opinion, *Munson Med. Ctr. v. Auto Club Ins. Assoc.,* 218 Mich.App. 375, 554 N.W.2d 49 (1996), *appeal denied,* 453 Mich. 959, 564 N.W.2d 887 (1996), again addressed the issue of "customary charges," *see id.* at 52. In *Munson* ACIA attempted to assess a provider's "customary charge" by considering what a provider received for a particular procedure under Medicare, Medicaid, Blue Cross Blue

Shield, and the workers' compensation schedule. *Id.* at 54. Citing *Hofmann*, the court rejected ACIA's arguments stating, "ACIA's use of criteria imposed by other statutory schemes or contractual agreements is hereby rejected as a matter of law." *Id.* at 56. A month after *Munson* was decided the court, in *Mercy Mt. Clemens Corp. v. Auto Club Ins. Assoc.*, 219 Mich.App. 46, 555 N.W.2d 871 (1996), *appeal denied*, 569 N.W.2d 168 (Mich.1997), reiterated and reaffirmed its holdings in *Munson* and *Hofmann* by rejecting an insurer's argument that it was entitled to discovery concerning a health care provider's receipt of payments from Medicare, Medicaid, Blue Cross, workers' compensation, HMOs, and PPOs so it could show the unreasonableness of the provider's bills. *See id.* at 872–74.

## IV. ISSUES & DISCUSSION

According to Plaintiffs' Complaint, prior to 1989 the Defendant Insurance Companies themselves audited the fees charged by health care providers and paid claims according to what the insurance companies determined to be "reasonable." However, in 1989 the Defendant Review Companies came into existence and solicited the insurance companies' medical claim-auditing work. Plaintiffs allege that the Defendant Insurance Companies are involved in a scheme with the Defendant Review Companies to cozen medical providers and pay lower benefits to the insureds by

> knowingly appl[ying] irrelevant data, irrelevant fee schedules and other irrelevant cost data in conducting their retrospective review of medical billings, so as to either totally deny health care providers and/or insureds' requests for reimbursement, or to artificially decrease the amount [the insurers] thereafter offered to pay for such health care.

They allege that the insurers knew when they solicited the insureds to purchase the policies, that, contrary to the representations contained in those policies, the insurers did not intend to pay what would actually be the insureds' ."reasonable" medical expenses, and that the Plaintiffs relied upon that "material misrepresentation" when they either bought the policies or provided medical services to those policy holders. Plaintiffs also allege that as part of this scheme, the insurance companies sent letters to medical providers who attempted to "balance bill" the insured/patients; those letters contained intentional misstatements of Michigan no-fault law, such as an assertion that the medical providers had no claims against the insured/patients because the "reasonable costs" had been paid and that the law required the providers to seek the remainder from the insurer. Further, Plaintiffs claim that some of the Defendants threatened to defend their insureds against the medical providers' debt-collection attempts against the insured/patients. Plaintiffs' multiple RICO counts are premised upon these alleged actions.

In order to state a RICO claim, Plaintiffs must allege an injury to their "business or property by reason of a violation of § 1962 of this chapter."[2] Plaintiffs claim violations only under 18 U.S.C. § 1962(b), which makes it unlawful for "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities' of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). Thus, to state a claim under § 1962(b), Plaintiffs must plead facts tending to establish that Defendants

(1) acquired or maintained

**2.** 18 U.S.C. § 1964(c). "Any person injured in his business or property by reason of a violation of § 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...." *Id.*

(2) through a "pattern of racketeering activity" or the "collection of an unlawful debt"

(3) an interest in or control of an enterprise

(4) engaged in, or the activities of which affect, interstate or foreign commerce.

### A. "RACKETEERING ACTIVITY" AND PREDICATE ACTS

■ "In order to establish 'racketeering activity' the plaintiffs must allege a predicate act," *Kenty v. Bank One, Columbus, N.A.,* 92 F.3d 384, 389 (6th Cir.1996), under 18 U.S.C. § 1961(1). Plaintiffs alleged mail and wire fraud, 18 U.S.C. §§ 1341, 1343, in all of their RICO counts, and extortion, MICH. COMP. LAWS ANN. § 750.213, in two of their RICO counts; mail and wire fraud and extortion are included in the definition of "racketeering activity" in § 1961. *See* § 1961(1)(A) (listing extortion chargeable under State law); § 1961(1)(B) (listing violations of 18 U.S.C. §§ 1341, 1343).

■■ *1. Mail/Wire Fraud:* Rule 9(b) of the Federal Rules of Civil Procedure provides that in a complaint alleging fraud, "the circumstances constituting fraud ... shall be stated with particularity." FED. R.CIV.P. 9(b). The purpose of Rule 9(b) is to provide fair notice to the defendant so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). The Sixth Circuit reads rule 9(b)'s requirement "liberally, ... requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir. 1993) (internal quotation marks and citation omitted). This liberal reading stems from the influence of Rule 8, which "re-

quires a 'short and plain statement of the claim,' and calls for 'simple, concise, and direct' allegations." *See id.; Michaels Bldg. Co.,* 848 F.2d at 679 (quoting FED. R.CIV.P. 8(a), (e)). Even against Rule 8's "backdrop admonition of simplicity in pleading," *id.,* "[h]owever, allegations of fraudulent misrepresentation[s] must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Coffey,* 2 F.3d at 162 (internal quotation marks and citation omitted).

■ The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme. *United States v. Brown,* 147 F.3d 477, 483 (6th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 270, 142 L.Ed.2d 223 (1998).

A scheme to defraud consists of intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end. *To allege intentional fraud, there must be proof of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension. Thus, the plaintiffs must allege with particularity a false statement of fact made by the defendant which the plaintiff relied on.*

*Kenty,* 92 F.3d at 389–90 (emphasis added) (internal quotation marks, modification and citations omitted).

Plaintiffs' complaint avers that the Defendants made two misrepresentations in furtherance of their alleged scheme to defraud. The first was the insurance companies' statements to prospective insureds that the insurance companies would pay all of the insured's reasonable and necessary medical charges arising out of automobile accidents. *See, e.g.,* J.A. at 162 (Complaint ¶ 168(a)). The second was the insurance companies' and/or the review companies' statements to the health care providers,

after the insureds' claims had been reviewed and discounted, that the amount the insurers had paid the providers was all the providers were entitled to receive under Michigan law. *See, e.g.,* J.A. at 163 (Complaint ¶ 168(d)). We address each in turn.

To support their claim that Defendants misrepresented their intention to pay for their insureds' reasonable auto accident-related medical expenses, Plaintiffs first alleged that the Defendants intended to accomplish their fraud through the knowing use of "irrelevant data, irrelevant fee schedules and other irrelevant cost data in conducting their retrospective review of medical billings, so as either to deny totally health care providers and/or insureds' requests for reimbursement, or artificially decrease the amount [the insurer] thereafter offered to pay for such health care," J.A. at 163, 166–67, 169, 173, 176, 178–79, 181, 184 (Complaint ¶¶ 168(c), 176(c), 183(c), 191(c), 198(c), 205(c), 212(c), 219(c)). The only factual support for this specific allegation appears in paragraphs 76 and 78 of the Complaint, J.A. at 122–24, which refer to the Complaint's attached Exhibits 28 and 30. Exhibit 28 is a detailed printout of a ManageAbility claim assessment, date-stamped January 7, 1993, denying full payment on a particular medical claim and stating, "Our data base, which includes input from peers for the same services, normal reimbursement from health care insurances, H.I.A.A. tables, and relative value studies at the local and regional level, suggest [sic] that this reimbursement is reasonable and customary, and complies with section 3107 of the No–Fault Law." J.A. at 264 (Complaint Ex. 28). Exhibit 30 is a letter, dated December 30, 1992, from ManageAbility to a health care provider which states, "Our assessment of what constitutes reasonable charges is not, as you suggest, arbitrary, but rather is determined by comparing several different data sources and then identifying what is reasonable to our client." J.A. at 266 (Complaint Ex. 30). Attached to this letter is a document entitled "Determination of Reasonable and Customary Charges," which states:

> ManageAbility uses several different sources of data to identify reasonable and customary medical fees. Among these are the HIAA (Health Insurance Association of America) tables, various health plan reimbursement schedules such as Blue Cross Blue Shield of Michigan, SelectCare, Health Alliance Plan (HAP), and the Michigan Workers' Compensation Fee Schedule. Most importantly, we collect and analyze billing data from peer providers for like procedures throughout the state of Michigan.

> ManageAbility compares provider charges against all of these data sources and then recommends reimbursements that are slightly higher than those of the group health plans, but certainly in line with their peers' average charges. At the providers' request the remuneration for a specific procedure will be judged by a member of our professional staff practicing in the same specialty.

> Our data are updated quarterly, but individual adjustments are made periodically on an as-needed basis.

J.A. at 268 (Complaint Ex. 30).

Plaintiffs' Complaint contains no facts supporting their allegation that these factors are "irrelevant." Review of Michigan's case law, *see supra* Part II, reveals that the Michigan courts have not found some of these factors, such as HIAA tables and billing data from peer providers, irrelevant; furthermore, the state courts did not issue opinions calling the other factors into question until a few weeks before this lawsuit was commenced on September 23, 1996,[3] years after the correspondence cited by Plaintiffs was sent. The fact that the

---

**3.** Indeed, although *Munson* was decided on August 23, 1996, it was not released for publication until October 15, 1996. *See Munson Med. Ctr. v. Auto Club Ins. Assoc.,* 218 Mich. App. 375, 554 N.W.2d 49, 49 (1996), *appeal denied,* 453 Mich. 959, 564 N.W.2d 887 (1996).

Defendants considered this data back in 1992 does not raise an inference that they did so as part of scheme to defraud their insureds and health care providers by using the data to assess the reasonableness of medical fees, or that the insurance companies' offers to pay for the insureds' "reasonable" PPI medical claims, as required under the statute, were knowingly false when made.

The only other arguable factual support for Plaintiffs' claim that Defendants misrepresented their intention to pay their insureds' reasonable medical expenses is the Plaintiffs' assertion that the fees paid by the Defendant Insurance Companies to Defendant Review Companies are "contingent upon the amount of savings (in the form of decreased payments to health care providers) the review companies' analyses yield[ ] for their insurance company clientele." J.A. at 118–19 (Complaint). While one might infer from such a fee arrangement the *potential* for fraud, Plaintiffs have failed to allege any fact—other than the mere existence of this fee arrangement—from which one could infer that the insurance companies and the review companies actually participated in a scheme to defraud the Plaintiffs.[4] As a matter of law we find that this bare allegation, without more, fails to meet the requirements of Rule 9(b). The mere possibility that an otherwise lawful payment system could be used to defraud does not create a inference of fraud sufficient to withstand a 12(b)(6) motion. *But see Brownell v. State Farm*

*Mut. Ins. Co.*, 757 F.Supp. 526, 538–39 (E.D.Pa.1991) (finding such a payment arrangement sufficient to plead a scheme to defraud).[5]

The second alleged misrepresentation made by Defendants was the insurance companies' and/or the review companies' statements to the health providers, after the insureds' claims had been reviewed and discounted, that the amounts the providers had received were all they were entitled to receive under Michigan law. J.A. at 163, 166, 169, 173, 176, 179, 182,-184–85 (Complaint ¶¶ 168(d), 176(d), 183(d), 191(d), 198(d), 205(d), 212(d), 219(d)). Assuming the Defendants' letters may be read to say this, Plaintiffs have not alleged facts which would support the inference that such statements were false. They have alleged no facts tending to show that the fees charged by the providers were "reasonable" (or that the amounts paid by the insurance companies were "unreasonable"), and Michigan law clearly states that health care providers are permitted to charge only a "reasonable" amount for auto-accident related medical care when the patient is covered by no-fault insurance, *see* MICH. COMP. LAWS ANN. § 500.3158; *McGill v. Automobile Assoc.*, 207 Mich.App. 402, 526 N.W.2d 12, 14 (1994) ("[M]edical care providers are prohibited by law from charging more than a reasonable fee."). Thus, what the providers received from the Defendants may very well have been all they were entitled to receive under Michigan's no-fault act.

---

4. Additionally we note that only against Defendant Linkage Enterprises, Inc. does the Complaint specifically allege this fee arrangement. As for the other review companies, it alleges the existence of such an arrangement only "upon information and belief."

5. In *Brownell*, the district court found, under facts somewhat similar to those alleged in the case before us here, that the complaint adequately stated a RICO cause of action against an insurer and a medical claim review company. In its assessment of whether the plaintiff had sufficiently alleged the predicate act of mail fraud, the opinion never mentions FED.R.CIV.P. 9(b), *see Brownell*, 757 F.Supp. at

537–39, and we do not think its holding is correct in light of the slightly more involved scrutiny that must be applied under Rule 9(b) as opposed to the general pleading requirements of Rule 8(a). While our precedent has stated that we liberally interpret Rule 9(b) against Rule 8(a)'s "backdrop admonition of simplicity in pleading," *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (1988), this precedent does *not* hold that Rule 8(a) *nullifies* Rule 9(b). Accordingly, to the extent that *Brownell* would counsel an outcome different from the one we reach here, we specifically disapprove the holding in *Brownell*.

Other than their general allegation of fraud, Plaintiffs allege no facts indicating that the providers' fees, rather than the insurance companies' payments, were the "reasonable" figures; the general allegation is not sufficient to satisfy Rule 9(b). The "reasonableness" of these charges is a legal conclusion, wholly unsupported by allegation of fact, and therefore it need not be accepted as true for purposes of 12(b)(6) review.

The district court did not err in holding that the complaint did not sufficiently plead mail and/or wire fraud as a predicate act.

*2. Extortion:* In Counts 8 and 10 of Plaintiffs' multiple RICO counts Plaintiffs also allege the predicate act of extortion. The factual allegations supporting these claims derive from letters sent by Defendants ACIA (Count 8) and Auto–Owners (Count 10) threatening litigation if the providers continued to bill the patient/insureds for the difference between the amount charged by the provider and the amount paid by the insurer ("balance billing").

To be guilty of extortion under Michigan law, one must:

(1) maliciously threaten, orally or by written or printed communication;

(2) either

 (a) to accuse another of any crime or offense or

 (b) to cause injury to the person or property or mother, father, husband, wife or child of another;

(3) with intent thereby either to

 (a) extort money or any pecuniary advantage whatever, or

 (b) compel the person so threatened to do or refrain from doing any act against his will.

*See* Mich. Comp. Laws Ann. § 750.213.

The district court found that the only "threats" alleged by Plaintiffs were the Defendants' statements indicating their intent to bring civil actions against the pro-viders if they continued to balance bill the patient/insureds, as the Defendants believed that under Michigan law the dispute over the unpaid balance was between the insurance company and the provider, rather than between the provider and the patient/insured. Accordingly, the district court dismissed the extortion allegation, finding that under Michigan extortion law, a threat to bring a civil suit to enforce one's rights cannot give rise to an action under the extortion statute. *See Various Mkts., Inc. v. Chase Manhattan Bank,* 908 F.Supp. 459, 468 (E.D.Mich.1995).

■ Appellants do not challenge the holding of the district court. Rather, they claim that the district court overlooked the fact that the Defendants also threatened *to accuse the providers of crimes* if they continued to balance bill the patients/insureds, and such a threat satisfies the Michigan extortion statute. *See People v. Watson,* 307 Mich. 378, 11 N.W.2d 926, 928 (1943) ("We believe the statute is sufficiently broad so as to cover a threat merely to publicly accuse another of a crime and that it does not require a threat to file formal complaint and instigate a criminal prosecution."). Appellants' argument is not well taken.

First, Appellees contend that Appellants' "threaten to accuse them of crimes" argument was not raised below and is therefore waived. Appellants respond that their complaint clearly alleges that the insurers' letters contained the statement that the providers "may be violating the Michigan Collection Act," and also that they have argued from the outset that the letters constituted "threats" rising to the level of extortion. This argument is not "new", they contend; rather it merely "expounds" on the same argument made earlier. (Appellant's Reply Br. at 17 n. 1.)

■ The purpose behind the waiver rule is to force the parties to marshal all of the relevant facts and issues before the district court, the tribunal authorized to make findings of fact. *See Hormel v. Helvering,*

312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).[6] The notion that the statement "you may be in violation of the Michigan Collection Act if you continue to [do a particular act]" amounts to a threat to accuse someone of a crime is anything but obvious, and the forum in which the Plaintiffs were required to urge this interpretation of the facts was the trial court. Accordingly, we agree with the Appellees' assertion that it is appropriate for us to apply the waiver rule in this instance.

■ Second, even if this argument was not waived, the statements made by the Defendants in the letters at issue cannot be construed as "threats to accuse the providers of crimes." Rather, they merely inform the providers that their actions may be in violation of the law. The Joint Appendix contains only Auto–Owners letter discussing "illegality;" that letter says, "Under Michigan Law, when a bill is in dispute, it is illegal for you to send them to collections. We ask that you cease with this action immediately." J.A. at 263 (Ex. 27). All of the ACIA letters referred to by Appellants, except one, state:

Our attorneys have advised us that if you continue to balance-bill our insured or report to a collection agency or credit reporting company that our insured has a delinquency, *you may be violating the Michigan Collection Act and/or the Fair Credit Reporting Act* and you may be subject to tort damages for libel and slander.

To repeat, our insured has no liability in this matter. If you bring a lawsuit

against our insured, we will defend and indemnify [him/her or them].

J.A. at 275–87 (Ex. 37–47) (emphasis added). These statements fall far short of threatening to make a public accusation that the providers are committing a crime. We note that ACIA did send an additional letter to one provider in response to his continued attempt to balance bill a patient/insured:

Again it has come to our attention that you are "balance billing" our insured. I also note you have been advised by letter that neither our insured nor we are responsible for these additional charges.

I highly recommend that you cease with your threats to the Wallaces. If you continue with your current position, *you will be violating the Michigan Collection Act and/or the Fair Report Act* and may be subject to tort damages for libel or slander.

If, in fact, you decide to report this to a collection agency, we will immediately act in the insured's behalf to have this removed and any action taken against the insured will result in our providing a defense.

You have been previously advised of your appeal process with the reviewing company. It is recommended that you pursue that option. Your dispute rests with them or the Auto Club, not with the insured.

J.A. at 288 (Ex. 48) (emphasis added). Although this letter uses the words, "will be violating" rather than "may be violating," it does not threaten to accuse the provider of committing a crime.[7] In fact,

---

**6.** In *Hormel* the Court stated:

Ordinarily an appellate court does not give consideration to issues not raised below. For our procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.

312 U.S. at 556, 61 S.Ct. 719.

**7.** We also observe that at least one of the Plaintiffs did to a Defendant the very thing that the Appellants are now claiming to be "extortion." Dr. Paul Kenyon wrote to ManageAbility,

Please be advised that if our patients are categorically told that our charges "are unreasonable," we will take legal action

the only threat this letter could be construed to make is that the insurance company would defend the insured if legal actions were pursued by the provider—hardly a threat at all, let alone a threat to accuse the provider of a crime.

Third, the threat must be "malicious." In *People v. Watson*, 307 Mich. 378, 11 N.W.2d 926, the female defendant engaged in an extramarital affair with the male victim, claimed to have become pregnant, asked for and received money from the victim for an illegal abortion, and then sent the victim a series of notes demanding more money for treatment of medical complications that she said had resulted from the abortion. After sending her numerous payments, the victim finally told her he could do no more, and the defendant threatened,

> Do you want me to go to the County House for this treatment? I am ready to air the whole thing—as I am doing the suffering—not you. If you don't—what other course have I—as if it wasn't for you I could tell him [8] all—as I don't care for myself. If you do not reply to this I will send him to come here and bring an attorney with him as I can't go on like this. You must know this is terrible. I can't help the condition—as you made me get rid of same—paid for it—and left me in this condition.

*Id.* at 927. In fact, the defendant had neither been pregnant nor had an abortion, and the whole scheme had been concocted to extort money from the victim. *This* is a "malicious" threat to accuse one publicly of a crime.

In contrast, Plaintiffs have pled no facts sufficient to raise an inference that the Defendants acted with a malicious intent when they sent the letters at issue. Indeed, Plaintiffs attached to their Complaint an "Interpretive Statement" issued

on October 23, 1992, by Michigan's Commissioner of Insurance, David J. Dykhouse, entitled "In the matter of Disputes Between No–Fault Automobile Insurers and Health Care Providers" which, after quoting Mich. Comp. Laws Ann. § 500.3107(1)(a) in toto, stated:

> The Insurance Bureau has received reports that no-fault insurers have questioned the reasonableness of some of the charges billed by health care providers for services rendered to their insureds and claimants following a motor vehicle accident. In some instances where the insurer and the provider have been engaged in such a dispute, the health care provider has billed the patient for the disputed amount and has vigorously pursued collection from the insureds or claimant directly.

> The purpose of this bulletin is to remind no-fault insurers that they are required to provide insureds and claimants with complete protection from economic loss for benefits provided under personal protection insurance. Auto insurers must act at all times to assure that the insured or claimant is not exposed to harassment, dunning, disparagement of credit, or lawsuit as a result of a dispute between the health care provider and the insurer.

> When such a dispute arises, an insurer will meet its statutory obligations by adhering to the following procedures. First, the insurance company must assume its statutory responsibility for complete protection of the insured. To do so, the insurer should notify the provider that the insurer is responsible for paying any reasonable charges, not the insured or claimant. Second, the insurer must also assure the policyholder or claimant of its responsibility. Insureds

---

against any company whose representative(s) make such statements. Our attorney has advised us that such statements constitute slander, defamation, interference with contractual relationships, interference with prospective business relationships, *and a*

*violation of various deceptive trade practices acts.*
J.A. at 265 (Ex. 29; emphasis added).

**8.** "Evidently, 'him' referred to defendant's husband." *Watson*, 11 N.W.2d at 927.

and claimants should be given directions on how to handle any bills or collection notices they receive. Third, the insurer should notify collection agencies and credit reporting agencies to disregard medical providers' claims against the insured for services covered under personal injury protection benefits. And finally, health care providers should be warned that the insurer will defend the insured or claimant against any attempt to collect, and may also consider any other appropriate action to prevent its policyholder from being pursued for collection.

A dispute between a medical provider and the insurer as to the reasonableness of the charge for services does not void the insurer's obligation to its insureds and claimants to pay the amount ultimately determined to be reasonable. The insurer also has an obligation to protect its insureds and claimants from any consequences of such a dispute.

J.A. at 261–62 (Complaint Ex. 26). An insurer reading this directive would have every reason to believe it his obligation to send the letters that the Plaintiffs now claim were extortionate. Plaintiffs argue that the Commissioner's Bulletin is irrelevant to their claim that Defendants acted with malice because the Bulletin does not have the force and effect of law and, therefore, Defendants' belief that it imposed a binding obligation on them was unfounded. That argument is without merit.[9] Even if such a bulletin lacks the force of law, it would certainly have lulled even the most skittish—or cynical—of insurers into believing that the sending of letters that complied with the bulletin's requirements was not a malicious act.

The district court did not err in finding that the complaint did not sufficiently plead extortion as a predicate act.

## B. ACQUIRING OR MAINTAINING AN INTEREST IN OR CONTROL OF AN ENTERPRISE THROUGH RACKETEERING ACTIVITY

A violation of § 1962(b) requires that the RICO defendant acquire or maintain an interest in, or control of, an enterprise *through* (or by way of) the pattern of racketeering activity. *Compagnie De Reassurance D'Ile De France v. New England Reinsurance Corp.*, 57 F.3d 56, 91–92 (1st Cir.1995), *cert. denied*, 516 U.S. 1009, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1189–90 (3d Cir.1993); *Danielsen v. Burnside–Ott Aviation Training Ctr.*, 941 F.2d 1220, 1230–31 (D.C.Cir.1991); *see also BancTraining Video Sys. v. First Am. Corp.*, 956 F.2d 268, 1992 WL 42345, at *5 (6th Cir.1992) (per curiam). In their motion to dismiss, Defendants argued that the Plaintiffs did not adequately plead this element of a RICO violation. The district court, however, found that because it was dismissing the case for failure sufficiently to allege predicate acts or an enterprise, it did not need to address this argument. When reviewing a district court's dismissal under FED.R.CIV.P. 12(b)(6), an appellate court may affirm the district court's decision on any ground supported by the record, even if different from the grounds relied on by the district court. *Andrews v. Ohio*, 104 F.3d 803, 808 (6th Cir.1997) (citing *City Management Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 251 (6th Cir.1994); *Russ' Kwik Car Wash, Inc. v. Marathon Petrole-*

---

**9.** *See McGill v. Automobile Assoc.*, 207 Mich. App. 402, 526 N.W.2d 12 (1994):

[D]efendants have expressly stated that they will defend and indemnify plaintiffs in the event that plaintiffs are sued by their providers for the outstanding balance. *Indeed they are directed to do so by a recent Interpretive Statement issued by the Commissioner of Insurance. It requires that no-fault insurers provide insureds and claim-*

ants with complete protection from economic loss for benefits provided under personal protection insurance.

*Id.* at 14 (emphasis added) (footnote omitted). The court stated in the footnote, "While the Commissioner of Insurance's Interpretive Statement, Bulletin 92–03, does not have the full force and effect of law, we generally give deference to administrative agency interpretations." *Id.* at 14 n. 1 (citations omitted).

*um Co.,* 772 F.2d 214, 216 (6th Cir.1985)). We think it is important to address this argument as well.

Defendants are correct. Plaintiffs' RICO counts are entirely silent with regard to *how* Defendants acquired or maintained an interest in or control of the enterprise, namely the association of the insurance company and the review companies,[10] through the alleged racketeering activity, namely mail/wire fraud and in some cases extortion. Rather, they simply parrot the language of the RICO statute by stating, "From at least 1992 forward, Defendants [insurance company and review company or companies] associated together to maintain, directly or indirectly, an interest in and/or control of an enterprise which was engaged in a pattern of racketeering activity...." J.A. at 162, 166, 169, 172, 175, 178, 181, 183–84 (Complaint ¶¶ 168, 176, 183, 191, 198, 205, 212, 219). This is nothing more than a conclusion, and the complaint alleges no facts in support of it. Furthermore, this parroted language complains that Defendants associated together *in order to* engage in the pattern of racketeering activity, not that they acquired their interests in or control of the enterprise *through* the racketeering activity. In *Lightning Lube* the Third Circuit stated:

> Furthermore, Lightning Lube's RICO pleadings fail to "allege a specific nexus between control of any enterprise and the alleged racketeering activity, as required under § 1962(b)." Instead, Lightning Lube merely avers that Witco and Avis maintain an interest in themselves and the joint venture. This allegation does not explain how such an interest *is the result of racketeering* as opposed to an interest derived from Witco and Avis's legitimate activities, and is thus insufficient.

10. The district court specifically held that the Plaintiffs had failed to adequately plead the existence of a RICO enterprise. We will not address that holding, as we must affirm its dismissal of the case due to Plaintiffs' failure

4 F.3d at 1191 (emphasis added and citations omitted) (quoting *Banks v. Wolk,* 918 F.2d 418, 421 (3d Cir.1990)). Plaintiff's Complaint wholly fails to plead this element of a violation of § 1962(b).

**C. INJURY TO BUSINESS OR PROPERTY "BY REASON OF" A VIOLATION OF § 1962(b)**

Finally, Plaintiffs fail to allege that they were injured by reason of the Defendants' acquisition or maintenance of an interest in or control of the enterprise. The civil remedy created by § 1964(c) authorizes recovery only for injury that a plaintiff suffers "by reason of" the RICO violation; therefore, a complaint for violation of § 1962(b) must allege an "acquisition or maintenance" injury separate and apart from the injury suffered as a result of the predicate acts of racketeering activity. *Danielsen,* 941 F.2d at 1231. The First Circuit in *Compagnie De Reassurance D'Ile De France* found such a flaw fatal:

> Under § 1962(b), the plaintiffs had to show that they were harmed by reason of NERCO's acquisition or maintenance of control of an enterprise through a pattern of racketeering activity. Again, even assuming that plaintiffs proved the underlying RICO violation, they failed to prove any harm *beyond that resulting from the fraud which constituted the predicate act.*

57 F.3d at 92 (emphasis added); *see also Danielsen,* 941 F.2d at 1231 ("Plaintiffs do not allege that their purported injury (underpayments of wages and benefits) was caused by the acquisition of an enterprise.... [P]laintiffs allege ... simply that their injuries result from 'the intentional and continuous underpayment of legally required minimum wages and fringe benefits.'"); *but cf. Craighead v. E.F. Hutton & Co., Inc.,* 899 F.2d 485, 494 (6th Cir.1990) (stating that plaintiffs' § 1962(a)

to adequately plead other necessary RICO elements. For purposes of the following analysis, we assume without deciding that Plaintiffs sufficiently pled a RICO enterprise.

claim fails "because they have not alleged injuries stemming directly from the defendants' alleged use or investment of their illegally obtained income. *Unlike section 1962(c), subsection (a) requires such a separate and traceable injury, and plaintiffs have alleged only injuries traceable to the alleged predicate acts.*") (emphasis added).

The Eastern District of Michigan concluded that a complaint nearly identical to the Plaintiffs' failed to allege the requisite injury to state a claim under § 1962(b):

> Similar to § 1962(a), in order to allege injury "by reason of" § 1962(b), a RICO plaintiff must demonstrate that the defendant's acquisition or control of an interstate enterprise injured plaintiff. In other words, injury from the racketeering acts themselves is not sufficient; rather, a plaintiff must plead facts tending to show that the acquisition or control of an interest injured plaintiff.

In the case at bar, plaintiffs allege as follows:

> That the defendants through a pattern of racketeering activity have acquired and maintained directly or indirectly an interest in or control of the enterprise, said enterprise engaged in and involved in the activities of which affect the interstate or foreign commerce is prohibited under 18 U.S.C. § 1962(b).

As with their § 1962(a) claim, plaintiffs' § 1962(b) claim essentially states that plaintiffs were injured by defendants' acts of racketeering. The amended complaint contains conclusory allegations which parrot each of the four parts of § 1962. Plaintiffs' complaint fails to allege that their injury resulted from the acquisition or control of an interest by defendants.. . . .

In sum, the proximate cause of plaintiffs' injuries as alleged in their complaint is defendants' alleged acts of racketeering themselves. Therefore, plaintiffs' RICO claims brought under § 1962(a) and (b) do not satisfy the requirement that the injury be "by reason

of" the use or investment, or the acquisition or control of an interest.

*Delorean v. Cork Gully,* 118 B.R. 932, 946 (E.D.Mich.1990) (citation omitted); *see also South Carolina Elec. & Gas Co. v. Westinghouse Elec. Corp.,* 826 F.Supp. 1549, 1562 (D.S.C.1993). The Eastern District of Michigan reiterated this holding in *Whaley v. Auto Club Ins. Assoc.,* 891 F.Supp. 1237 (E.D.Mich.1995), *aff'd,* 129 F.3d 1266, 1997 WL 720451 (6th Cir.1997) (unpublished per curiam):

> [A]ccording to 18 U.S.C. § 1964(c), plaintiff can only seek a civil remedy under RICO if her business or property was injured by reason of the § 1962(b) violation. Contrary to plaintiff's assertion, one does not violate § 1962(b) by committing mail fraud or extortion. Instead, one must use racketeering activity to gain control or interest in an enterprise. In other words, plaintiff cannot simply allege that she was injured by the underlying acts of mail fraud and extortion. Rather, she must allege that she was injured by a violation of § 1962(b). In this case, in order to be injured by a violation of § 1962(b), plaintiff must show that her alleged injuries resulted from Auto Club having maintained an interest in itself as an enterprise.

*Whaley,* 891 F.Supp. at 1242; *see also id.* at 1242–43 (discussing how *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985), did not compel a different outcome).

The Plaintiffs here have alleged only injury resulting from the "scheme to defraud" or "scheme to extort" (*i.e.,* the racketeering activity), rather than from the acquisition of an interest in or control of the alleged enterprise. *See, e.g.,* J.A. at 168 (Complaint ¶ 179) ("The above described scheme to defraud both the Plaintiff insureds, and ... health care providers, conducted by the enterprise as described above, has caused the Plaintiff insureds and the Plaintiff health care

providers to suffer damages ....”); J.A. at 171 (Complaint ¶ 187) (“The above described scheme to ... attempt to extort acts or omissions against the wills of health care providers, conducted by the enterprise described above, has caused the Plaintiff insureds and the Plaintiff health care providers to suffer damages ....”).

As we have heretofore explained, Plaintiffs have wholly failed to allege any facts sufficient to state a claim for violation of § 1962(b), *i.e.*, that Defendants acquired or maintained, through a pattern of racketeering activity, an interest in an enterprise. It follows, therefore, that they have not alleged any injury by reason of such violation.

## CONCLUSION

Because Plaintiffs’ complaint does not adequately allege predicate acts constituting “racketeering activity,” or allege that Defendants acquired or maintained any interest in or control of an enterprise through racketeering activity, or that Plaintiffs suffered injury as a result of Defendants’ acquiring or maintaining an interest in or control of an enterprise through racketeering activity, we AFFIRM the district court’s dismissal of Plaintiffs’ complaint for failure to state a claim upon which relief could be granted, FED.R.CIV.P. 12(b)(6).

We decline to remand this case to the district court to permit Plaintiffs to amend their complaint. It is clear from the voluminous Complaint and its 104 attached exhibits that Plaintiffs cannot state a claim that any of the Defendants violated § 1962(b) and that Plaintiffs suffered injuries as a result. *Cf. EEOC v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir.1993) (quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir.1991), for the proposition that “[w]here *a more carefully drafted* complaint *might* state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the ac-

tion with prejudice”) (emphasis added). Indeed, it is clear that what Plaintiffs have sought to cast as RICO violations are in fact disputes over who was entitled to determine what “reasonable” means in the world of health care costs. The crux of Plaintiffs’ complaint is that whatever a “reasonable charge” might be in any given circumstance, the Defendants intended at all times not to pay that amount. We think that where the law requires that the Defendants pay only the reasonable costs, but does not require reasonableness to be determined by some neutral party and contains no standards whatsoever for gauging what is reasonable, an allegation that the Defendants promised to pay the reasonable charge while intending to pay less than the reasonable charge cannot even state a claim for fraud as a matter of law.